**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

        **Plaintiff,**

        v.

[2] JOSHUA ENRIQUE BULA-CARTAGENA,

        **Defendant.**

**CRIM. NO. 24-124-2 (RAM)**

<u>**OPINION AND ORDER**</u>

RAÚL M. ARIAS-MARXUACH, United States District Judge

    Pending before the Court is Defendant Joshua Enrique Bula-Cartagena's ("Bula") *Motion Requesting Revocation of Detention Order or De Novo Bail Hearing under 18 U.S.C. 3145(b)*. (Docket No. 79). The Court granted a *de novo* bail hearing on April 23, 2024. (Docket No. 84). Accordingly, only Defendant's motion for revocation of the detention order ("*Motion*") remains. For the reasons set forth below, the Court **GRANTS** the *Motion* subject to the conditions specified herein and in the separate order of release.

**I.   BACKGROUND**

    On March 29, 2024, a *Complaint* was filed against Mr. Bula and his three co-defendants, Luis Nomar Isaac-Sanchez ("Isaac"), Kevin Manuel Bonilla-Ramirez ("Bonilla"), and Eli Yaniel Couvertier-Pollock ("Couvertier") for aiding and abetting the possession of a machine gun on October 31, 2023. (Docket Nos. 1 and 1-1). The

four co-defendants were originally charged in the Court of First
Instance, San Juan Superior Court ("Commonwealth Court"). (Docket
No. 16 at 2). The Commonwealth Court dismissed the case against
Mr. Bonilla on November 7, 2023, and against Messrs. Isaac, Bula,
and Couvertier on March 25, 2024. Id.

The federal *Complaint* was filed shortly after, and Mr. Bula
was arrested on April 1, 2024. (Docket Nos. 1 and 6). The
Government moved for detention without bail on April 3, 2024.
(Docket No. 16). The next day, a Grand Jury returned a one-count
Indictment charging the four co-defendants with illegal possession
of a machine gun, aiding and abetting, in violation of 18 U.S.C.
§§ 922(o) and 2. (Docket No. 19 at 1).

On April 4, 2024, Magistrate Judge Marcos E. López held a
detention hearing and found there were no conditions of release
that could reasonably assure the safety of any other person and
the community. (Docket No. 63 at 2). The Magistrate Judge noted in
the detention order that Mr. Bula was seated in an area where a
firearm was recovered, and there was evidence that he illegally
possessed multiple firearms in the months directly preceding his
arrest. Id. at 3. Defendant subsequently filed his *Motion* on April
22, 2024, contending that reasonable conditions could be fashioned
and that statistics regarding pretrial services violations
demonstrate that felony recidivism is rare in the District of

Criminal No. 24-124-2 (RAM)                                            3

Puerto Rico. (Docket No. 79). The Court held a *de novo* hearing, which took place on April 29, 2024. (Docket No. 93).

At the hearing, the Government called Homeland Security Investigations ("HSI") Special Agent Michael Villanueva-Acevedo ("SA Villanueva") and presented several exhibits. The Defendant called Rebecca Rivera-Ramos ("Rivera"), upon which the Government recalled SA Villanueva as a rebuttal witness. Finally, Mr. Bula submitted statistical reports and a letter of employment during argument.

## II.  FINDINGS OF FACT

The Bail Reform Act directs the judicial officer to include written findings of fact in a detention order. *See* 18 U.S.C. § 3142(i)(1). The below findings of fact are drawn only from the information and testimony presented at the *de novo* hearing conducted on April 29, 2024.[1] Furthermore, these findings of fact have been made solely for the purpose of deciding the pending *Motion*. *See* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence.").

---

[1] Exhibits relevant to the *de novo* hearing were filed at Docket Nos. 94 and 95. Later references to these exhibits shall be cited as follows: (Exhibit __). Transcripts of other exhibits as well as English translations will be filed on the docket within ten days of the *de novo* hearing.

**A. Testimony of SA Villanueva**

SA Villanueva testified he became familiar with the case because it was referred to him by the Puerto Rico Police Bureau ("PRPB"). On October 31, 2023, the PRPB received a tip that armed individuals would be leaving an establishment and getting into a Jeep Grand Cherokee. According to SA Villanueva, the establishment is run by a criminal organization that generally does not allow just "anybody" to be armed while there.

During the surveillance, PRPB agents observed four individuals approach the car. Among them was Mr. Isaac, who had a firearm protruding from his front waistband. After the four entered the vehicle, a marked police car conducted a stop, and all four individuals ran from the officers. Although Mr. Isaac fled on foot for approximately ten minutes, the other three co-defendants were quickly detained. SA Villanueva conceded that in his affidavit in support of the *Complaint*, only Mr. Isaac is mentioned as having fled. Additionally, a firearm was discharged by one of the PRPB officers during the stop.

Prior to the stop, Mr. Isaac was in the driver's seat, Mr. Bonilla was in the front passenger's seat, and Mr. Couvertier was in the driver's side rear passenger seat. SA Villanueva initially testified that Mr. Bula was in the front passenger seat, then later

corrected his testimony to state that Mr. Bula had been sitting in the rear seat on the passenger side.

After the PRPB apprehended all four co-defendants, agents observed a pistol in the center console of the vehicle. They applied for a commonwealth search warrant, which was granted. Pursuant to that warrant, the PRPB discovered that the pistol in the center console had been modified to fire fully automatic through a device known as a "chip." Additionally, agents also discovered a firearm with a red dot sight and flashlight attachment that was **not** modified to fire fully automatic near the rear passenger seat where Mr. Bula had been sitting. PRPB also seized rounds of ammunition, approximately four magazines, a mask, and the co-defendants' cell phones.

Mr. Bula's cell phone was on his person at the time of his arrest. He provided HSI agents with consent to search his phone. *See* (Exhibit 1). During a preliminary search of the phone, HSI agents found several pictures of Mr. Bula with firearms. Pursuant to a forensic extraction conducted toward the end of November 2023, additional information was discovered.

First, a preliminary device report (Exhibit 2) displayed the last known phone number used by the cell phone seized from Mr. Bula, a number ending in 4428. Additionally, two email accounts

are associated with Apple IDs tied to the device: joshuabula917@gmail.com and elinquilinobula@gmail.com.

Next, SA Villanueva testified that he had found several photographs from Mr. Bula's phone, that included the following:

1. A picture taken or created July 7, 2023, depicting Mr. Bula with a rifle-style firearm on his waistband. (Exhibit 3).

2. A picture taken or created on September 17, 2023, showing Defendant with two pistols in his pockets. (Exhibit 4).

3. A picture showing Mr. Bula holding two rifles, one in each hand, with two pistols in his pockets. (Exhibit 5).

4. A picture taken or created on July 16, 2023, of Defendant holding a pistol in his hand that SA Villanueva stated was very similar to the pistol recovered on October 31, 2023. (Exhibit 6).

Additionally, SA Villanueva twice attempted to interview Mr. Bula. On October 31, 2023, Defendant provided consent to search his cell phone, but invoked his *Miranda* rights, so an interview was not conducted. On April 1, 2024, after Mr. Bula's federal arrest, SA Villanueva spoke with him for approximately twenty-five minutes. During that latter interview, Defendant stated that he has been known by the nickname "Inquilino" ever since a famous rapper gave him that name. Additionally, he said that on October 31, 2023, every occupant of the vehicle ran away from the police.

SA Villanueva also reviewed chat messages that he attributed to the Defendant because they are from someone using the name "Inquilino" and the phone number ending in x4428 that was associated with Mr. Bula's phone. The conversations are described as follows:

1. On January 18, 2023, Mr. Bula sent two pictures of pistols, to which his co-defendant, Mr. Couvertier, replied asking for the price. (Exhibits 7, 8, and 9). Defendant then responded with a message stating "the same price that they left it for you last time."[2] (Exhibit 7).

2. Another participant in the chat group also asked how much the pistols were, to which Mr. Bula replied in an audio message that the third pistol had been sold, and that the price of the pistols is $1,600. (Exhibits 57 and 60-1). SA Villanueva testified that he believed the speaker on the audio message was Defendant based on their interactions.

3. A second chat, which is dated January 23, 2023, involves Mr. Bula sending pictures of two AK-style firearms. (Exhibits 11, 12, and 13). A co-defendant, Mr. Bonilla, then replies with dollar signs and a question mark to

---

[2] The original message is in Spanish, and the English translations are pending. This interpretation is drawn from SA Villanueva's testimony at the *de novo* hearing.

inquire about the price of the firearms, and Mr. Bula replied "29," meaning $2,900. (Exhibit 11).

4. Another participant in the group chat then inquires "Fulet3?," which SA Villanueva interpreted as a question regarding whether the firearm is fully automatic, to which Mr. Bula replied "No." (Exhibit 11).

5. On January 24, 2023, Mr. Bula sent a photo of a pistol with two magazines alongside text indicating the firearm's price was $1,550 and that it came with seven magazines. (Exhibits 14 and 15).

6. On January 27, 2023, Mr. Bonilla sent a message discussing *palos*, slang for rifle, and *piezas*, slang for pistols. (Exhibit 16). Mr. Bonilla then used an abbreviated version of Mr. Bula's nickname, "Inqui," and asked if the rifle was still available. Id. Mr. Bula replied that it was. Id.

7. On June 27, 2023, Mr. Bula's cell phone forwarded a message that reads "23 gen5 full *y* 3 *peines de* 22" to an individual named "Bache." (Exhibit 20). SA Villanueva testified that this message refers to a Glock 23, generation 5, that is fully automatic and has three magazines of 22 rounds each. Then, Mr. Bula states the price is $1,600. Id. Bache replies, asking if the price can be lowered to $1,500. Id. Bache also states his intent to make the firearm fully

automatic quickly. Id. After this exchange, Mr. Bula sent
two voice messages reiterating the features of the firearm,
including that it is already fully automatic. (Exhibits 21
and 22). Additionally, Mr. Bula stated that on the street,
without the accessories, the pistol would be worth $1,400.
(Exhibit 23).

8. On September 23, 2023, a message sent from the phone ending
in x4428 wrote "*Es inqui*,"[3] referring to Mr. Bula's
nickname, Inquilino. (Exhibit 17).

9. On October 4, 2023, Mr. Bula sent a picture of what appears
to be marijuana to an individual named "Geral." (Exhibits
17 and 18). Defendant then sent another message that "they"
can send him three pounds. (Exhibit 17). Defendant then
stated that he would have to provide $1,500, which SA
Villanueva understood as the price of the marijuana. Id.
Mr. Bula sent a message referring to a strain of marijuana
as "zaza," and Geral replied that the strain would be more
expensive. Id. Defendant then said that they would be able
to get about $7,000, which SA Villanueva testified meant
the profit for selling the marijuana. Id.

---

[3] This translates to "it's Inqui."

10. Later that same day, Mr. Bula sent a photo of a pistol, two magazines, and a weapons attachment to Geral. (Exhibits 17 and 19).

SA Villanueva stated that he believed that Defendant had been granted bond during the pendency of his Commonwealth Court case. When asked if he had uncovered any evidence that dealt with Mr. Bula's behavior while on bond, SA Villanueva replied: "No, I was not able to gather that."

**B. Testimony of Ms. Rivera**

Ms. Rivera works in pretrial services for the Commonwealth Court, where she has been an employee for almost twenty-four years. She was assigned to supervise Mr. Bula while he was on bond pending resolution of the Commonwealth Court case, although she testified that this was "very little" time and later stated it was "very brief." During his supervision, Mr. Bula appeared at all the hearings in his case and met with Ms. Rivera as ordered. She stated that he exhibited "very good behavior" in these monthly meetings, and to her knowledge, committed no bail violations. However, she also testified that all of her notes regarding his supervision had been destroyed in a fire at the Commonwealth Court about a week prior to the *de novo* hearing.

Ms. Rivera further noted that Defendant would have been informed of all the terms of release, including a no-contact

provision prohibiting contact with witnesses or other persons
involved in the case. (Exhibit 24). She stated that if she had
proof that Mr. Bula had contacted his co-defendants, that would
have been a violation of his supervision. However, she was unable
to supervise him when he was not at the Commonwealth Court. During
the period of supervision, Ms. Rivera never asked to see
Defendant's cell phone, never asked for a urine sample for drug
testing, and never visited him at his residence because she did
not have any cause to. Mr. Bula was subject to electronic
monitoring, and he did not violate the terms of this monitoring
while under supervision. Finally, Ms. Rivera did not receive any
information that Defendant possessed firearms while on bond.

**C. Rebuttal Testimony of SA Villanueva**

The Government recalled SA Villanueva to rebut the contention
that Defendant never violated the conditions of bond. Prior to
taking the stand, he conferred with the Assistant U.S. Attorney
and reviewed a cell phone extraction report. SA Villanueva
testified that co-defendant Mr. Bonilla was arrested for the
instant federal offenses and had a cell phone on him at the time.
An extraction of Mr. Bonilla's cell phone was performed, and SA
Villanueva reviewed some of the resulting evidence. On December
14, 2023, Mr. Bonilla wrote to Defendant in Spanish that two people
wanted *piezas*, or pieces, which SA Villanueva interpreted as

firearms. Mr. Bula responded with an attachment that was a
"sticker,"[4] in violation of his bond. Additionally, SA Villanueva
believed that the person who responded to Mr. Bonilla was the
Defendant because that account bore the name "Inquilino," Mr.
Bula's nickname. However, the agent could not recall if the message
originated from a phone number associated with Defendant.

When asked on cross-examination why he had testified earlier
that there was no evidence of illegal activity conducted by Mr.
Bula after October 31, 2023, SA Villanueva explained that on
direct, he had testified about a different cell phone extraction,
namely one derived from the seizures of October 31, 2023.

D. **Further Submissions by Defendant**

During argument, Mr. Bula, through counsel, submitted
additional exhibits in support of his motion. First, he presented
a Pretrial Services Violations Summary Report, indicating that in
the District of Puerto Rico, there were only 2 felony re-arrests
among the 927 cases in release status in the year ending March
2023. (Exhibit A). Second, he introduced a Pretrial Services
Detention Summary Report indicating that the average length of
pretrial detention in the District of Puerto Rico was 731 days,
the third longest of all the districts. (Exhibit B). Defendant's

---

[4] Stickers are illustrations or images without a background that can be sent
through various chat applications, including WhatsApp.

last exhibit was a letter from a prospective employer. (Exhibit C).

### III. LEGAL STANDARD

#### A. Standard of review for a detention or release order

A district court reviews a magistrate judge's order of detention or release under a de novo standard and "need not defer to the magistrate judge's findings or give specific reasons for rejecting them." United States v. Cidraz-Santiago, 18 F. Supp. 3d 124, 126 (D.P.R. 2014) (citations omitted). A district court may also "take additional evidence or conduct a new evidentiary hearing" when "the defendant has placed relevant facts at issue." Id.

#### B. The Bail Reform Act

Pursuant to the Bail Reform Act of 1984, a judicial officer must determine whether a person charged with an offense shall be detained or released pending trial. See 18 U.S.C. § 3142(a). Section 3142(e) of the Bail Reform Act provides that if, after conducting a hearing, "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." Id. § 3142(e).

A statutory presumption in favor of detention does not apply to this case. *See* United States v. Berríos-Aquino, 2022 WL 17075919, at \*2 (D.P.R. 2022) (noting that the offense of possession of a machine gun is not listed in sections 3142(e)(2) or (3) of the Bail Reform Act). However, the Bail Reform Act authorizes pretrial detention in cases that involve a felony that involves the possession or use of a firearm or any other dangerous weapon. *See* id.; 18 U.S.C. § 3142(f)(1)(E). Detention is also authorized in cases where there is a serious risk that the defendant may flee. *See* id.; 18 U.S.C. § 3142(f)(2)(A).

    i.   Standard of proof

The standard of proof for detention on the grounds of dangerousness is clear and convincing evidence. 18 U.S.C. § 3142(f). Clear and convincing evidence is "more than preponderance of the evidence but less than beyond a reasonable doubt." United States v. Acevedo-Ramos, 600 F. Supp. 501, 509 (D.P.R. 1984) (citations omitted), *aff'd*, 744 F.2d 203 (1st Cir. 1985) (Breyer, J.). This standard requires "a high degree of certainty that the information presented supports the conclusion of dangerousness or risk to the obstruction of justice." Id. On the other hand, the standard of proof for detention on the grounds of risk of flight is preponderance of the evidence. United States v. Patriarca, 948 F.2d 789, 793 (1st Cir. 1991).

ii.  <u>Factors the Court must consider</u>

To determine whether there are conditions of release that
assure a defendant's appearance and the safety of the community,
judicial officers must consider the following factors: (1) the
nature and circumstances of the offense charged; (2) the weight of
the evidence against the defendant; (3) the defendant's personal
history and characteristics; and (4) the nature and seriousness of
the danger to any person or the community that would be posed by
the defendant's release. 18 U.S.C. § 3142(g).

## IV.  DISCUSSION

After considering the proffers of counsel, the evidence
presented, the arguments of the parties, the Pretrial Services
Report, and the recording of the initial detention hearing, the
Court finds that the Government has not proven by the relevant
standards that no conditions of release could reasonably assure
the safety of the community and Defendant's appearance as required.

**A. The nature and circumstances of the offense charged**

As discussed above, Mr. Bula was charged with illegal
possession of a machine gun, aiding and abetting. (Docket No. 19).
This is a serious offense. *See* <u>Berríos-Aquino</u>, 2022 WL 17075919,
at *2; <u>United States v. Diaz-Collazo</u>, 2018 WL 377277, at *2 (D.P.R.
2018). If convicted, Defendant faces up to ten years' imprisonment.
*See* 18 U.S.C. § 924(a)(2). Moreover, the Government notes that the

machine gun at issue was found in the center console of a vehicle that would have presumably been driven on a public street. This circumstance of the offense also favors detention. *See* Diaz-Collazo, 2018 WL 377277, at *2 (noting that the defendant possessed a machine gun in a public area); United States v. Mieses-Casiano, 161 F. Supp. 3d 166, 169 (D.P.R. 2016) (ordering detention of defendant who carried machine gun on public sidewalk, ran from the police, and tossed firearm while fleeing).

There is some lack of clarity about whether Defendant fled from the PRPB just prior to his October 31, 2023, or if that flight might have been due to the discharge of an officer's firearm. The Government presented evidence that Mr. Bula told SA Villanueva in an interview that he had fled. However, Mr. Bula's attorney cross-examined the Government's witness about the absence of any reference to Defendant's flight in the *Affidavit* supporting the *Complaint*, even though it had detailed how Mr. Isaac led a PRPB officer on a foot chase. The Court recognizes that the standard to establish a risk of flight is low: a preponderance of the evidence. Thus, the evidence presented as to whether Mr. Bula ran from authorities at the time of his arrest weighs slightly in favor of detention based on his risk of flight.

**B. The weight of the evidence against Defendant**

The Government presented several exhibits throughout the *de novo* hearing, including photos and videos of the Defendant holding various firearms and group chat messages discussing gun sales. However, the majority of this presentation constituted evidence that, pursuant to Fed. R. Evid. 404(b), related to **other** crimes, wrongs, or acts separate from the offense charged in the indictment. *But see* Berríos-Aquino, 2022 WL 17075919, at *2-*3 (considering videos of defendant shooting a machine gun on other occasions in evaluating the weight of the evidence).

As related to the events of October 31, 2023, the weight of evidence for bail purposes derives from the testimony of SA Villanueva, who was not present at the scene himself but had interviewed Mr. Bula and reviewed materials related to the case. The Court also notes that the federal Grand Jury has found probable cause by returning a true bill against the four co-defendants. Thus far, there is no evidence presented before the Court that is "inconsistent with a finding of guilt." Diaz-Collazo, 2018 WL 377277, at *2 (citing United States v. Gray, 529 F. Supp. 2d 177, 181 (D. Mass. 2007)). This factor then, tilts the needle slightly in favor of detention.

Regardless of the import or weight of the evidence proffered by the Government, the Court is not concerned with Mr. Bula's guilt

or innocence at this stage. *See* 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as modifying or limiting the presumption of innocence."). The Court's task is to assess whether there is a set of conditions that "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c).

## C. Defendant's personal history and characteristics

Per the Pretrial Services Report, Mr. Bula has been a lifelong resident of Puerto Rico. He does not have a passport, has never traveled outside of the United States, and only speaks Spanish. He has been in a two-year relationship with his partner, who is currently pregnant with his child. Mr. Bula's partner, mother, and father attended the *de novo* hearing in his support. Although Defendant has no record of steady employment and is financially supported by his parents, he also has no verified criminal history outside of the instant case. Furthermore, his attorney presented a letter at the *de novo* hearing indicating that Mr. Bula has secured a job since his most recent federal arrest. Together, these factors strongly indicate that Defendant is unlikely to be a risk of flight, and they favor release. *See* Mieses-Casiano, 161 F. Supp. 3d at 169 (finding that characteristics such as lifelong residency in Puerto Rico, lack of passport, fluency only in Spanish, and dearth of travel outside of United States favored release).

### D. **The nature and seriousness of the danger to any person or the community that would be posed by Defendant's release**

The Government presented numerous photos showing Mr. Bula carrying pistols and rifles in public places.[5] Additionally, the Court takes note that a non-automatic firearm was recovered close to where Defendant had been sitting in the Jeep Cherokee. He has also consumed cannabinoids occasionally, including just a few days prior to his federal arrest. These factors suggest that Defendant poses a danger to the community, especially when put in the context of the evidence presented by the Government that Mr. Bula trafficked in both weapons and significant quantities of a more expensive strain of marijuana. *See* Diaz-Collazo, 2018 WL 377277, at *2 (regarding defendant's possession of marijuana at the same time he was in possession of a loaded firearm). *See also* United States v. Torres-Rosario, 658 F.3d 110, 113 ("[D]rug dealing is notoriously linked to violence"); United States v. Rojas-Batista, 2018 WL 2214743, at *3 (D.P.R. 2018) (noting the higher grade and expense of the type of marijuana trafficked when considering the nature and circumstances of the offense in a drug trafficking case).

---

[5] Although the Pretrial Services Report does not indicate whether Mr. Bula had a permit or not, it appears from the transcript of the initial detention hearing that his attorney impliedly conceded he did not have a license. *See* (Docket No. 54 at 45). Additionally, Puerto Rico law prohibits open carrying of firearms even if the individual has a license. *See* United States v. Aviles-Vega, 783 F.3d 69, 73 (1st Cir. 2015).

Even more troubling is the evidence presented by the Government that an account associated with the Defendant's phone number has engaged in numerous discussions regarding the sale of firearms, including automatic ones. These conversations support the notion that "defendant's conduct may be very well encouraging unlawful possession of" firearms, including machine guns. Berríos-Aquino, 2022 WL 17075919, at *4 (nonetheless granting release under conditions). Defendant was not merely illegally carrying firearms. He also brokered sales of these dangerous weapons to unknown persons with unknown motives. *See* id. Such actions can pose serious danger to the community.

Defendant offered a statistical report about the low rate of felony re-arrests for defendants released pretrial in this district to suggest that he would not pose a danger to the community if released. As the Government pointed out, this argument suffers from sampling bias. The fact that there is a low rate of violations of pretrial conditions is a testament to the careful work performed by judicial officers in making detention determinations. Just because released defendants generally acquit themselves well pending trial does not mean that Mr. Bula will, and each detention determination requires an "individualized analysis." Patriarca, 948 F.2d at 794.

The Government further presented evidence on rebuttal that Mr. Bula violated the conditions of his release. The Court notes that the testimony would have been more proper if presented in the case-in-chief, although that fact alone does not preclude it. *See* United States v. LiCausi, 167 F.3d 36, 52 (1st Cir. 1999) (citations omitted). Given that the rules concerning admissibility of evidence do not apply to detention hearings, *see* 18 U.S.C. § 3142(f), and that Defendant was permitted to introduce documentary evidence through counsel, there is no need to quibble too much about evidentiary niceties. *See* LiCausi, 167 at 52 (noting that the determination about what constitutes rebuttal evidence or the order of presenting evidence lies within the discretion of the trial judge).

However, of note is the fact that SA Villanueva had testified during the Government's initial presentation that he had not gathered evidence of Mr. Bula's conduct on bond, a prior inconsistent statement. Defendant's counsel aptly cross-examined SA Villanueva as to this issue. It appears there is documentary evidence—although not presented in the *de novo* hearing—that supports the agent's rebuttal testimony. Thus, considering that documentary evidence and having observed the witness' demeanor in the courtroom, the Court finds SA Villanueva credible on the issue of whether Mr. Bula committed a violation of his commonwealth bond

conditions. That being said, there was no testimony presented about the content of the "sticker" that Mr. Bula sent Mr. Bonilla. The nature of Defendant's previous bond violation is therefore unclear. Moreover, at the time the message was sent, commonwealth charges against Mr. Bonilla had already been dismissed. The Court believes that conditions can be fashioned that reasonably reduce the risk of further communications between Mr. Bula and others regarding firearms trafficking. **The Court stresses that he must not have any contact with his three co-defendants or any other witnesses while his federal case remains pending**, and that the U.S. Probation Officer be allowed access to his phone or other electronic devices to ensure compliance with the terms of release.

Mr. Bula's mother, a homemaker, offered to serve as a third-party custodian. However, he was residing with her when photos of him holding firearms were taken; when he was arrested on October 31, 2023; and when he communicated with Mr. Bonilla on December 14, 2023. Defendant's mother is therefore unlikely to be able to effectively monitor his conduct. Thus, the Court will permit Mr. Bula's pretrial release only if an alternative third-party custodian is found suitable by the U.S. Probation Office.

Although Mr. Bula is accused of a serious offense, the Court finds that there are conditions of release that can reasonably

assure the safety of the community and Defendant's appearance as
required in this case.

## V.   CONCLUSION

For the foregoing reasons, the Defendant's *Motion Requesting
Revocation of Detention Order or De Novo Bail Hearing under 18
U.S.C. 3145(b)* at Docket No. 79 is **GRANTED**. The Defendant Joshua
Enrique Bula-Cartagena shall be released subject to the following
conditions:

1. Defendant must not violate federal, state, or local law
   while on release.

2. Defendant must cooperate in the collection of a DNA
   sample if it is authorized by 42 U.S.C. § 14135a.

3. Defendant must advise the Court, the U.S. Probation
   Office, or the supervising officer in writing before
   making any change of residence or telephone number.

4. Defendant must appear in court as required and, if
   convicted, must surrender as directed to serve a
   sentence that the Court may impose.

5. Defendant will execute an unsecured bond binding
   Defendant to pay the United States the sum of $10,000
   dollars in the event of a failure to appear as required
   or to surrender as directed for service of any sentence
   imposed.

6. Defendant will submit a proposed third-party custodian,
   as approved by the U.S. Probation Office, who is not his
   mother and who resides outside of the Sabana Abajo Public
   Housing Project. The third-party custodian must agree to
   (a) supervise Defendant, (b) use every effort to assure
   his appearance at all court proceedings, (c) notify the
   Court immediately if Defendant violates a condition of
   release or is no longer in the custodian's custody, and
   (d) surrender any firearms he or she might possess.

7. Defendant shall submit to location or electronic monitoring as directed by the U.S. Probation Office or supervising officer and comply with all the program requirements and instructions provided.

8. Defendant's release is conditioned upon qualification of the third-party custodian and of his or her residence with Defendant, as well as verification by the United States Probation Office of electronic monitoring device capability in the proposed residence.

9. Home detention with electronic monitoring: Defendant shall be restricted to his and the third-party custodian's residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the U.S. Probation Officer.

10. Defendant shall continue or actively seek employment.

11. Defendant shall maintain or start an education program.

12. Defendant shall submit to supervision by and report for supervision to the U.S. Probation Office.

13. Defendant shall surrender any passport to the U.S. Probation Office.

14. Defendant shall not obtain a passport or other international travel document.

15. Defendant shall reside at the address of record that is approved by the U.S. Probation Office.

16. Defendant shall not leave the jurisdiction of this District without first obtaining written permission from the Court.

17. Defendant shall avoid all contact directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including all co-defendants of the instant case.

18. Defendant shall permit access by the U.S. Probation Office, the supervising officer, and the third-party custodian to any computers (as defined in 18 U.S.C. § 1030(e)(1)) or other electronic communication devices in his possession to ensure compliance with the conditions of release.

19. Defendant shall undergo medical or psychiatric treatment if deemed necessary by the U.S. Probation Office.

20. Defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapons.

21. Defendant shall refrain from excessive use of alcohol.

22. Defendant shall refrain from use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical practitioner.

23. Defendant shall submit to testing for a prohibited substance if required by the U.S. Probation Office or the supervising officer. Testing may be used with random frequency and may include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or any form of prohibited substance screening or testing. Defendant must not obstruct or attempt to obstruct, or tamper with, the efficiency and accuracy of prohibited substance screening or testing.

24. Defendant shall participate in a program of inpatient or outpatient substance abuse therapy and counseling as deemed necessary by the U.S. Probation Office or the supervising officer.

25. Defendant shall report as soon as possible any contact with any law enforcement personnel, including, but not limited to, any arrest, questioning, or traffic stop to the U.S. Probation Office or the supervising officer.

26. The Chief U.S. Probation Officer or his designee may authorize temporary changes of address and overseas travels to the mainland United States only, not exceeding fifteen calendar days, provided the U.S.

Attorney has no objection to it. If objected, the request must be made in writing to the Court.

27. Defendant shall not enter any airport or pier with the exception stated above.

28. Defendant shall not enter or remain at any of the named places in the instant Indictment, or the Sabana Abajo Public Housing Project.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 9th day of May 2024.


                                    s/Raúl M. Arias-Marxuach
                                    UNITED STATES DISTRICT JUDGE